|  | AUSA: | Thomas Tynan | Telephone: (202) 768-1136 |
|---|---|---|---|
| AO 106 (Rev. 04/10) Application for a Search Warrant | Special Agent: | Claudia Link | Telephone: (313) 965-5378 |

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH<br>CELLULAR TELEPHONE ACCOUNT (313)<br>909-9000 THAT IS STORED AT PREMISES<br>CONTROLLED BY AT&T WIRELESS | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. | Case: 5:18-mc-50119-1<br>Judge: Levy, Judith E.<br>Filed: 01-23-2018 |
|---|---|---|---|

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- [x] evidence of a crime;
- [ ] contraband, fruits of crime, or other items illegally possessed;
- [x] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1347, 18 USC § 1349 | Health Care Fraud and Conspiracy to Commit Health Care Fraud |
| 18 USC § 371 | Conspiracy to Pay and Receive Illegal Rumenerations |

The application is based on these facts:

See attached AFFIDAVIT.

- [x] Continued on the attached sheet.
- [ ] Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Claudia Link
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____ January 23, 2018 _____

City and state: _____ Detroit, Michigan _____

_____
*Judge's signature*

Mona K. Majzoub          U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: <br><br> INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE ACCOUNT (313) 909-9000 THAT IS STORED AT PREMISES CONTROLLED BY AT&T WIRELESS | Case No. <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Claudia M. Link, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by AT&T Wireless, a wireless provider headquartered at 11760 U.S. Hwy. 1, N. Palm Beach, Florida 33408, and for information associated with a certain account that is stored at premises controlled by Microsoft, Inc. ("Microsoft"), an electronic mail ("email") provider headquartered at 1 Microsoft Way, Redmond, Washington 98052.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support

of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AT&T Wireless and Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since July 2002.  As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud and financial crimes, and I have been personally involved in investigations concerning health care fraud, illegal health care kickbacks, and methods used to finance and conceal the profits of those operations.  I investigate health care crimes that often involve the use of computers and mobile telephones to commit violations of federal laws.  I have gained experience regarding the use of computers and mobile telephones in criminal activity, and the investigation of such activities, through formal training and in everyday work relating to these investigations.

3.     I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation, as well as information provided to me by other law enforcement agencies, including the U.S. Department of Health and Human Services-Office of Inspector General ("HHS-OIG").  Information pertinent to this investigation was also provided by AdvanceMed, the current zone program integrity contractor for HHS responsible for performing investigations and audits designed to protect the Medicare program ("Medicare") from fraud, waste, and abuse.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## <u>JURISDICTION</u>

4.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## RELEVANT STATUTES

5.      Title 18, United States Code, Section 1347, prohibits health care fraud.  Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1)      to defraud any health care benefit program; or

(2)      to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

6.      Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347.

7.      Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

4

8.      Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by Medicare, a federal health care benefits program as defined by 18 U.S.C. § 24(b).

9.      Title 42, United States Code, Section 1320a-7b(b)(1)(A), prohibits knowingly and willfully soliciting and receiving any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part by Medicare, a federal health benefits program as defined by 18 U.S.C.§ 24(b).

10.     Title 18, United States Code, Section 371 provides that it is a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

## THE MEDICARE PROGRAM

11.     Medicare is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

12.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

13.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid for by Part A.

14.     This investigation involves physician services and home health care services.  Physician services are covered by Part B.  Home health care services typically involve skilled nursing, physical therapy, and speech pathology services to homebound patients.  Home health services are covered by Part A.

6

15.     Medicare claims for Parts A and B are processed and paid by insurance organizations, known as fiscal intermediaries and carriers respectively, who contract with CMS to administer their specific part of the Medicare program.

16.     Medicare will not pay for or reimburse services that are procured by kickbacks in violation of Title 42, United States Code, Section 1320a-7b(b).

## HOME HEALTH CARE REQUIREMENTS

17.     Medicare's regulations for home health services require a home health agency ("HHA") to be licensed by the state in which it is located, submit an application to Medicare, and be certified by a state agency.  A qualified HHA receives a Medicare provider number that is used for the submission, processing, and payment of claims.

18.     Medicare coverage for home health services requires that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is "homebound" and does not have a willing care-giver to assist him or her; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse (RN) (or therapist if only therapy services are provided) from the home health agency; (d) skilled nursing services are provided by, or under

the supervision of, an RN in accordance with the Plan of Care; and (e) the services provided are medically necessary.

19.    A beneficiary is considered "homebound" if he or she has a condition, due to an illness or injury, that restricts his or her ability to leave the home except with the aid of another individual or a supportive device, or if the beneficiary has a condition such that leaving his or her home is medically contraindicated.

20.    To determine the proper level of care for a particular beneficiary, Medicare requires that HHAs perform a comprehensive initial evaluation, which includes a patient specific, comprehensive assessment that accurately reflects the patient's current health and provides information to measure the patient's progress. Medicare requires that (1) an RN or qualified therapist perform the initial assessment (on an OASIS form), and (2) HHAs maintain a clinical record of services they provide to each beneficiary, including signed and dated clinical and progress notes recording each home visit made to the beneficiary (Skilled Nursing Notes).  Skilled Nursing Notes must include the identity of the individual who performed the visit, the name of the patient, and the type of service performed. Medicare compensation to HHAs is based upon a prospective payment system (PPA), which pays the HHA a base payment that can be adjusted to reflect the severity of the beneficiary's condition and care needs.  Medicare PPS pays HHAs

for every 60-day "episode" of services provided to each beneficiary. At the

beginning of an episode, Medicare will pay 60 percent of the cost of the episode

once the patient has been evaluated and a Plan of Care determined.  At the end of

the episode, Medicare pays the balance based on how much home health care was

actually provided in the episode.  If the beneficiary is still eligible for care at the

end of an episode, a second episode of services can be provided.  Each subsequent

episode must be based upon a new assessment of the patient, including a new

OASIS form, wherein the beneficiary's physician and RN (or therapist) re-certifies

the beneficiary's medical condition, need for services, and a new Plan of Care.

## INVESTIGATIVE BACKGROUND

21.    In late 2016 and early 2017, the FBI and HHS-OIG initiated an

investigation into the payment and receipt of health care kickbacks in exchange for

patient referrals by SHARON KING ("KING"); KING's daughter, SHER KING;

PERSONAL TOUCH HOME HEALTH CARE, INC. ("PERSONAL TOUCH");

INIJ HOME HEALTH CARE, INC. ("INIJ"); and THOMAS D. MAYS, JR.

("MAYS").  Specifically, the investigation revealed that KING and SHER KING

engaged in a scheme with MAYS, PERSONAL TOUCH, and INIJ to submit and

cause the submission of false and fraudulent claims to Medicare for services that

were medically unnecessary or not rendered, and/or for services that were procured through illegal kickbacks and/or bribes.

22.    As explained in more detail below, KING recruited Medicare beneficiaries for PERSONAL TOUCH, INIJ, and MAYS in exchange for health care kickbacks that PERSONAL TOUCH and INIJ paid to KING or to KING's daughter, SHER KING.  KING advertised and offered various services to seniors at residential buildings, provided the seniors with food, and arranged for massage therapy services and tax return assistance.  In return, the Medicare beneficiaries agreed to accept purported home health services provided by PERSONAL TOUCH and INIJ, and purported physician services provided by MAYS.  These purported home health and physician services were often medically unnecessary, not actually provided, and/or induced by health care kickbacks.

23.    MAYS often served as the referring provider for the beneficiaries recruited by KING.  From January 1, 2014 through November 20, 2017, MAYS was the second highest referring physician of Medicare beneficiaries to PERSONAL TOUCH and INIJ.  For the beneficiaries that MAYS referred to PERSONAL TOUCH and INIJ during that same time frame, Medicare paid PERSONAL TOUCH approximately $710,454.88 and INIJ approximately $828,217.21.

## RELEVANT ENTITIES

### *Senior Fellowship Services ("SFS")*

24.     KING recruited beneficiaries through her business, SFS.  According to records filed with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), KING incorporated SFS as a domestic nonprofit corporation in August 2007.  In an Annual Report filed in July 2009, KING identified her daughter, SHER KING, as President.

25.     Although LARA records indicate that SFS was dissolved in October 2011, law enforcement officers observed KING driving a van with the name "Senior Fellowship Services" in April 2017.  Further, as explained below, witnesses identified SFS as KING's business.

### *Community House of Services ("Community House")*

26.     According to records file with LARA, Community House was incorporated as a domestic nonprofit corporation in May 2010.

27.     Beginning in approximately April 2013, SHER KING became an officer of Community House, and, in August 2014, became the registered agent.

28.     According to Annual Reports filed in October 2014, KING became the President of Community House.

11

*Personal Touch*

29.     PERSONAL TOUCH is a home health agency enrolled as a provider with Medicare.

30.     According to LARA records, KELLY N. HOBSON incorporated PERSONAL TOUCH in November 2005.  As of June 2017, CHARLES L. HOBSON, JR. is the registered agent.

31.     On July 7, 2014, both CHARLES L. HOBSON JR. and KELLY HOBSON certified to Medicare on behalf of PERSONAL TOUCH that they would comply with all Medicare rules and regulations, including that PERSONAL TOUCH would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare, and would refrain from violating the federal Anti-Kickback Statute.

32.     For claims submitted between January 1, 2014 and November 20, 2017, Medicare paid PERSONAL TOUCH approximately $3,404,173.10.

*Inij*

33.     INIJ is a home health agency enrolled as a provider with Medicare.

34.     According to LARA records, FARZANA HARIS ("HARIS") incorporated INIJ in March 2011.

35.     According to Medicare enrollment records, HARIS is the owner of INIJ.

36.     On July 29, 2011, HARIS certified to Medicare, on behalf of INIJ, that she would comply with all Medicare rules and regulations, including that she would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and would refrain from violating the federal Anti-Kickback Statute.

37.     For claims submitted between January 1, 2014 and November 20, 2017, Medicare paid INIJ approximately $3,211,000.19.

### Thomas Mays, MD, P.C.

38.     MAYS operates a clinic known as "Thomas Mays, MD, PC."

39.     MAYS is an enrolled provider with Medicare, and as such, has certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and would refrain from violating the federal Anti-Kickback Statute.

## PROBABLE CAUSE

40.     Probable cause is established by statements from Medicare beneficiaries and other witnesses, Medicare data, and financial records.  This

13

evidence demonstrates that KING recruited Medicare beneficiaries for

PERSONAL TOUCH and INIJ in exchange for kickbacks.  Additionally, this

evidence shows that the services purportedly provided by PERSONAL TOUCH,

INIJ, and MAYS were medically unnecessary and/or not provided, but nonetheless

billed to Medicare.  Finally, the evidence also shows that KING used the cellular

telephone account (313) 909-9000 ("Cellular Account") and email account

seniorfellowshipservices@hotmail.com ("Email Account") to carry out these

crimes.

### A.    STATEMENTS BY MEDICARE BENEFICIARIES

#### 1.    D.B. and H.R.

41.    On or about February 16, 2017, agents interviewed Medicare

beneficiaries D.B. and H.R., who live together in Detroit, Michigan.  Both H.R.

and D.B. identified KING and MAYS in photographs.

42.    D.B. identified KING as someone who distributed produce to

residents in D.B.'s building, and identified MAYS as a physician that he/she met

through KING.  D.B. agreed to see MAYS because he/she does not have

transportation and expected MAYS to visit him/her at her residence.  D.B. was

able to take the bus, but the bus ride to MAYS's office is long.  As of the

interview, D.B. met with MAYS twice: on one occasion, MAYS visited D.B. at his/her residence, and on another, KING drove D.B. to MAYS's office.

43.     Beginning in August 2016 and at KING's request, D.B. agreed to receive home health care services from PERSONAL TOUCH rather than from D.B.'s previous home health care company.  A PERSONAL TOUCH physical therapist visited D.B. three times a week.  The physical therapist would visit D.B. for a month, then stop, and then resume the visits a month later.

44.     After a physical therapy visit in January 2017, D.B. cancelled the physical therapy because the therapy was not helpful.  A PERSONAL TOUCH nurse also visited D.B., but D.B. cancelled the service after four visits because the nurse only took D.B.'s blood pressure.

45.     Medicare claims data shows that, for services purportedly provided to D.B. between July 22, 2016 and July 6, 2017, MAYS billed Medicare for one home visit, fourteen office visits, and six physician certifications for home health care, and seventeen home health care supervision procedure codes.  For that same date range, MAYS billed Medicare $4,690 and was paid $2,166.95 for twenty-six claims for services purportedly provided to D.B.

46.     Additionally, Medicare claims data shows that Medicare paid PERSONAL TOUCH $5,508.34 for two episodes of home health care services in August 2016 and November 2016, both referred by MAYS.

47.     H.R. told agents that MAYS visited him once at his residence.  After that initial visit, H.R. did not see MAYS again because H.R. had the feeling that MAYS was not legitimate.  H.R. denied receiving services from PERSONAL TOUCH.

48.     Medicare claims data shows that, for services purportedly provided to H.R. from July 22, 2016 to April 27, 2017, MAYS billed Medicare for one home visit, three office visits, and two physician certifications for home health care, and five home health supervision procedure codes.  For those same dates of service, Mays billed Medicare $1,470 and was paid $853.75 for seven claims for services purportedly provided to H.R.

49.     Additionally, Medicare claims data shows that Medicare paid PERSONAL TOUCH $1,814.49 for home health care services referred by MAYS and purportedly rendered to H.R. beginning in July 2016.

### 2.     Confidential Human Source (CHS)

50.     On or about May 10, 2017, agents interviewed a Medicare beneficiary, who later became a confidential human source for law enforcement.

16

During this interview, CHS identified KING in a photograph as someone who assisted residents in his/her apartment building obtain food.

51.     On two occasions, KING drove CHS to MAYS's office for a visit with MAYS.  Although CHS already had a primary physician, CHS agreed to see MAYS at KING's request because KING told CHS that "Senior Fellowship Services" was free.

52.     In approximately 2016, KING sent someone from a home health agency to CHS's apartment for physical therapy, even though CHS had previously told KING that he/she did not need services in his/her home, and that he/she had already been receiving physical therapy through another outpatient provider.  CHS told agents that he/she traveled to the outpatient provider by first walking from his/her apartment to the bus stop, from where he/she then traveled by shuttle to the outpatient provider.  Employees from PERSONAL TOUCH nonetheless visited CHS at home.

53.     On one occasion, the PERSONAL TOUCH employee asked CHS to sign multiple visit forms, including visit forms for dates during which the employee had not seen CHS.  When CHS asked why he/she should sign the forms, the employee responded, "you just need to sign."  CHS admitted he/she signed the notes for visits that did not take place.

17

54.     After a few visits from the PERSONAL TOUCH employee, CHS told the employees their services were not useful.  CHS no longer receives services from PERSONAL TOUCH.

55.     After agreeing to work with law enforcement, CHS recorded a visit with MAYS.  On June 1, 2017, KING drove CHS from his/her residence to MAYS's office.  On the way, KING picked up another Medicare beneficiary, H.B., who also visited with MAYS.  During the drive, KING discussed law enforcement's recent efforts to investigate prescription drug diversion.  KING mentioned that MAYS previously prescribed the Medicare beneficiary "Norcos," but now only prescribes "Tylenol 4s."

56.     During the visit, MAYS asked CHS whether he/she wanted home health care.  CHS indicated that he/she had been receiving outpatient physical therapy.  MAYS responded by suggesting that he/she send nurses but not therapists.   MAYS saw CHS for approximately five minutes.  After the visit, KING went back to see MAYS.

57.     Additionally, CHS told law enforcement that, while he/she was in the waiting room, H.B. complained that he was missing some of his prescriptions. According to CHS, KING then sent a text message to MAYS, who appeared in the waiting room and gave H.B. another prescription.

58.     Data from the Michigan Automated Prescription System ("MAPS") shows that on June 1, 2017, MAYS wrote H.B. a prescription for 120 pills of acetaminophen/codeine, also known as "Tylenol 4s."  Between July 2016 and April 2017, MAYS wrote H.B. ten prescriptions for acetaminophen/hydrocodone, also known as "Norcos."

59.     Medicare claims data shows that, between October 20, 2015 and July 12, 2017, MAYS billed Medicare for eleven home visits, ten office visits, and seven physician certifications for home health care, and fifteen home health supervision codes for CHS.  For those same dates of service, MAYS billed Medicare $5,460 and was paid $2,854.75 for thirty-one claims for services purportedly provided to CHS.

60.     Medicare claims data also shows that Medicare paid PERSONAL TOUCH $9,348.32 for four episodes of home health care services referred by MAYS and purportedly rendered to CHS between January and October 2016.

61.     CHS did not recognize the name INIJ.  Yet, Medicare claims data shows that Medicare paid INIJ $3,608.16 for one episode of home health services referred by MAYS and purportedly rendered to CHS in October 2015.

## B.   OTHER WITNESS STATEMENTS

### 1.   Former INIJ Employee

62.     On or about July 20, 2016, and again on January 25, 2017, agents interviewed L.S., who worked at INIJ from approximately May 2013 until 2016. L.S. told agents that KING owned a business known as SFS.  KING visited various senior residential centers and provided food to the seniors purportedly from SFS's food bank.  When delivering food, KING identified seniors on Medicare who agreed to receive home health care services in exchange for food, and brought them home health certification forms that were already signed by a doctor, including MAYS.

63.     HARIS, the owner of INIJ, paid KING $750 for each patient she referred to INIJ.  KING told L.S. that $750 was her rate for patient referrals.  L.S. saw checks written by HARIS to KING for such referrals.  Sometimes KING asked HARIS to write the checks in the name of her daughter, SHER KING. Additionally, L.S. knew that KING worked with MAYS because KING's patient referrals were faxed to INIJ with MAYS's name on the paperwork.  L.S. advised that KING maintained similar relationships with other home health care agencies in the Detroit area, including PERSONAL TOUCH.

64.     L.S. told KING that paying for patient referrals was illegal.  KING responded that she used the kickbacks to pay for beneficiaries' activities.  L.S. also confronted HARIS about the illegal kickback payments.  HARIS responded by saying that KING was bringing patients to INIJ.

### 2.     Building Manager A.N. and KING Employee E.D.

65.     On or about May 10, 2017, agents interviewed A.N., a manager of the senior building located at 5100 Brush Street in Detroit, Michigan.  A.N. discovered that an individual named E.D was giving massages to residents of the Brush Street building.  A.N. questioned E.D. about these massages, and E.D. said that KING hired him/her.

66.     After speaking with A.N., agents interviewed E.D., who confirmed that KING hired him/her to give free massages to specific residents in the community rooms of three different senior buildings.  KING contacted the residents in advance, and then told E.D. in a text message which residents should receive a massage.  KING instructed E.D. to maintain a sign-sheet when administering the massages.  The sign-in sheet included the recipient's age and telephone number; KING emphasized to E.D. that they must show that the resident was elderly.  E.D. gave the sign-in sheets to KING at one of the senior buildings.  KING paid E.D. $10 for two thirty-minute massages.

21

### 3.    Building Manager M.L.

67.    On or about June 21, 2017, agents interviewed M.L., the manager of a senior building located in Pontiac, Michigan.  M.L. assists residents with social issues, managing bills, and matters related to their insurance, including Medicare and Medicaid.  M.L. confirmed that KING contacted him/her by email, and understood that KING worked for a company called SFS.  KING wanted to provide services to seniors in the building, such as offering free fruits and vegetables and full body massages.

68.    M.L. stated that two residents had advised M.L. that KING had offered them dinner in exchange for agreeing to see a doctor in Southfield, Michigan.  Additionally, M.L. stated that a resident had informed him/her that the resident received physical therapy services from INIJ as a result of receiving massage therapy.  M.L. contacted INIJ to confirm the company's relationship with KING; the owner of INIJ said that KING was a community liaison for INIJ.

69.    Based on my training and experience, I know it is common for individuals who engage in health care fraud and the payment of kickbacks to refer to marketers who are paid to recruit patients as "community liaisons."

## C.   FINANCIAL RECORDS

70.    Medicare deposited reimbursements into a Comerica bank account for "Personal Touch Home Health Care" ending in x6667.  CHARLES L. HOBSON, SR., CHARLES L. HOBSON II, and KELLY N. HOBSON are authorized signers for Comerica bank account x6667.

71.    Medicare deposited reimbursements into a PNC bank account for "INIJ Home Health Care, Inc." ending in x6447.  HARRIS is an authorized signer for PNC bank account x6447.

72.    Checks written from the PERSONAL TOUCH and INIJ bank accounts discussed above were deposited into bank accounts controlled by KING and SHER KING.

73.    In total, between 2014 and February 2017, KING, SHER KING, SFS, and Community House received approximately $130,445 in checks signed from PERSONAL TOUCH account x6667, and approximately $198,425 in checks from INIJ account x6447.  Many of these checks are in even amounts, which, based on my knowledge and experience, are indicative of kickback payments for patient referrals.

74.    Additionally, several checks written from the INIJ bank account to SHER KING and signed by HARIS contain notations in the memo line that read,

23

"3 activities," "5 activities," or "2 activities."  The amounts for these checks are equivalent to $750 multiplied by the number of "activities" indicated in the memo line.  For example, a check identifying "5 activities" was written for $3,750, and the check indicating "3 activities" was written for $2,250.  These amounts are consistent with L.S.'s statement (explained above) that HARIS paid KING $750 per patient referral.

## PROBABLE CAUSE REGARDING USE OF THE SUBJECT ACCOUNTS TO EXECUTE THE SCHEME

75.    Records produced by AT&T Wireless in response to a grand jury subpoena identify the subscriber for the Cellular Account as Community House, discussed above.

76.    Grand jury records produced by AT&T Wireless also identified the phone numbers with which the Cellular Account exchanged text messages.  Of the phone numbers that exchanged text messages with the Cellular Account, agents searched a law enforcement database to identify which were associated with CHARLES HOBSON, HARIS, and MAYS.

77.    According to this information, from approximately 2014 to June 2017, the Cellular Account exchanged over 13,400 text messages with phone numbers associated with CHARLES HOBSON, over 12,500 text messages with phone

numbers associated with HARIS, and over 8,700 text messages with phone

numbers associated with MAYS.

78.    Additionally, as discussed above in paragraph 66, KING exchanged

text messages with E.D., who KING hired to provide free massages to residents in

senior buildings.  When interviewed, E.D. allowed law enforcement to access

his/her cell phone, and to review and photograph text messages that E.D. had

exchanged with KING for purposes of scheduling the massages at the senior

buildings.  E.D.'s cell phone listed "King Sharon" as a contact with the Subject

Account as the corresponding cell phone number, and contained text messages

from KING sent between April 24, 2017 and May 11, 2017.

79.    For example, on April 24, 2017, KING sent E.D. the following text

message:

> Tomor patients
> Robt Holmes bldg.
> 5100 brush Cor e Warren
> –Fred Hicks 1-2 p
> 1 hr plz
> -Bessie Johnson 2-2:30 only
> ½ hr
> -Michael Farr 2:30-3 only
> ½ hr

80.    Similarly, on May 2, 2017, KING sent a text message to E.D. that

stated:

> Good morn [sun emoji].
> Yes, today at Pontiac bldg.
> 47251 Woodward Ave.
> Across street Frm Pontiac
> Pub library.
> 1-3 pm
> Table & All materials already there.

81.    And, in a text message to E.D. on May 11, 2017, KING told E.D. that:

> I handled the situation at
> yesday bldg.
> How. any people you saw on
> mon. I hve the Tuesday
> numbr.
> And how many you saw
> yesterday before you were
> interrupted?

82.    Based on my training and experience, these text messages show that KING regularly communicated with E.D. to arrange for the provision of free massages to Medicare beneficiares who agreed to accept home health care and purported physician services.  In other words, KING used the Cellular Account as a means to induce beneficiaries to accept services covered by Medicare.

83.    Additionally, as discussed above (*see* ¶ 67), KING contacted M.L. by email to coordinate senior services in M.L.'s building.  M.L. voluntarily provided agents copies of emails that she received from KING.  These emails show that KING routinely used the Email Account to organize events intended to induce

beneficiaries to accept purported physician services and home health care. Further, KING sent several of these emails from an iPhone; these emails contain the footer "Sent from my iPhone" and include a signature block that includes KING's name and the number for the Cellular Account.

84. For example, on March 6, 2017, on an iPhone, KING emailed M.L. from the Email Account and attached a flyer, which stated: "1st Serve Those With: A Cane, Walker, Motor or Wheel Chair Then Serve The Rest Free! Free Fruits & Vegetables Bring Bags[.]" KING also attached a sign-in sheet, which provided space for the attendees' names, apartment numbers, age, and phone numbers.

85. On April 4, 2017, on an iPhone, KING emailed M.L. from the Email Account and asked: "On Tuesday Apr 11th while we're having Fruits & Vegs 1-2 pm Can we also have our 1st SPA DAY. ( full body massages)  Starting 12 noon – 2:30?  In the room upstairs you told me about ? [*sic*]  That room sets a private mood for massages.  Remember, I described the set up simulates a spa atmosphere with Aroma therapy candles & tranquil music . [*sic*] So the recipient can enjoy their experience.  The 1st full body massages are for those who are currently receiving physical therapy or will be.  They will see how massage therapy enhance the physical therapy they are already receiving, or may be receiving in the future.  I emailed a Spa Day flyer. Along with another fruits & Vegs flyer . . . ."  The

27

attached flyer advertising for the "spa day" states, "ONLY <u>WHO ARE</u> OR <u>WILL BE RECEIVING PHYSICAL THERAPY</u>", and again includes a sign-in sheet, and identifies the Cellular Account as the phone number for SFS.

86.   On April 27, 2017, KING emailed M.L. from the Email Account and asked M.L. to fax her "[t]he sign in sheet from last weeks Spa Day."

87.   Further, as discussed above (*see* ¶¶ 55-57), on June 1, 2017, KING drove CHS and H.B. to MAYS's office for a purported office visit.  While conducting surveillance of this visit, law enforcement observed KING, CHS, and H.B. enter the office building for MAYS's practice at approximately 11:15 am and exit the office building at approximately 1:05 pm.  The CHS reported that, during this time, H.B. complained to KING that he did not have all of his prescriptions. Thereafter, CHS observed KING access a phone and send MAYS a text message. Moments later, MAYS entered the waiting room and handed H.B. another prescription.

88.   The grand jury records produced by AT&T show that on June 1, 2017, between 11:32 am and 12:50 pm, the Subject Account exchanged over twenty text messages with a phone number associated with MAYS.

89.   Based on the information above, there is probable cause to believe that both the Cellular Account and Email Account were used in a conspiracy to

defraud Medicare, a scheme to defraud Medicare, and/or a conspiracy to pay and/or receive health care kickbacks.  That is, the preceding information shows that KING used the Cellular Account and Email Account to coordinate recruiting events at senior buildings and to coordinate purported physician visits with MAYS.

90.     On July 27, 2017, pursuant to 18 U.S.C. § 2703(f), the government sent AT&T Wireless a request to preserve all stored communications, records, and other evidence associated with the Cellular Account for 90 days.  This preservation request expired on approximately October 25, 2017.  On November 1, 2017, the government sent AT&T Wireless a renewed preservation request for another 90 days.   Despite the government's delay in renewing the preservation request, a representative from AT&T Wireless confirmed for law enforcement that AT&T Wireless still possessed information for the Cellular Account.

91.     Also on July 27, 2017, pursuant to 18 U.S.C. § 2703(f), the government sent Microsoft a request to preserve all stored communications, records, and other evidence associated with the Email Account for 90 days.  In response, Microsoft notified the government that it would preserve any such information for 90 days from August 23, 2017.  On November 1, 2017, the government renewed its preservation request for 90 days.

92.     In general, an email that is sent to a Microsoft subscriber is stored in the subscriber's "mail box" on Microsoft's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Microsoft's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Microsoft's servers for a certain period of time.[1]

## **CONCLUSION**

93.     Based on the forgoing, I request that the Court issue the proposed search warrant.  Because warrants will be served on AT&T and Microsoft, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

94.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

---

[1] It is possible that Microsoft stores some portion of the information sought outside of the United States.  In *Microsoft Corp. v. United States*, 2016 WL 3770056 (2d Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States.  As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Microsoft.  The government also seeks the disclosure of the physical location or locations where the information is stored.

95.     I further request that the Court order AT&T Wireless and Microsoft not to notify any person, including the subscribers or customers of the accounts listed in Attachment A, of the existence of the search warrant until further order of the Court.  *See* 18 U.S.C. § 2705(b).  In this case, such an order would be appropriate because the requested warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, or notify confederates.   *See* 18 U.S.C. § 2705(b)(2), (3), (5).

## REQUEST FOR SEALING

96.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change

patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Claudia M. Link
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
Presence and/or by reliable electronic means,

January 23, 2018

Mona K. Majzoub
UNITED STATES MAGISTRATE JUDGE

32

# <u>ATTACHMENT A</u>

## Property To Be Searched

This warrant applies to information associated with cellular telephone account (313) 909-9000 that is stored at premises owned, maintained, controlled, or operated by AT&T Wireless, a wireless provider headquartered at 11760 US Hwy 1, N. Palm Beach, Florida 33408.

## **ATTACHMENT B**

### **Particular Things To Be Seized**

**I.      Information to be disclosed by AT&T Wireless**

To the extent that the information described in Attachment A is within the possession, custody, or control of AT&T Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to AT&T Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), AT&T Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations;

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.      Detailed billing records, showing all billable calls including outgoing digits;

g.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number);

h.      Incoming and outgoing telephone numbers;

i.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.      All records pertaining to communications between AT&T Wireless and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy), and 42 U.S.C. § 1320a-7b (health care kickbacks), including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) The offering or payment of illegal health care kickbacks;

(b) The solicitation or receipt of illegal health care kickbacks;

(c) Health care fraud;

(d) Conspiracy to defraud the United States, or conspiracy to commit health care fraud;

(e) All records that refer or relate to the referral of medical patients to home health agencies, physicians, or other providers;

(f) Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

(g) Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(h) The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

(i) The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the offering or payment of illegal health care kickbacks; the solicitation or receipt of health care kickbacks; or health care fraud, including records that help reveal their whereabouts.

<u>**CERTIFICATE OF AUTHENTICITY OF**</u>
<u>**DOMESTIC BUSINESS RECORDS**</u>
<u>**PURSUANT TO FEDERAL RULE OF**</u>
<u>**EVIDENCE 902(11)**</u>

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by AT&T Wireless, and my official title is _____.  I am a custodian of records for AT&T Wireless.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of AT&T Wireless, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of AT&T Wireless; and

c.      such records were made by AT&T Wireless as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____         _____
Date                            Signature

AUSA:   Thomas Tynan          Telephone:   (202) 768-1136

AO 93  (Rev. 11/13) Search and Seizure Warrant     Special Agent:     Claudia Link          Telephone:   (313) 965-5378

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH<br>CELLULAR TELEPHONE ACCOUNT (313)<br>909-9000 THAT IS STORED AT PREMISES<br>CONTROLLED BY AT&T WIRELESS | )<br>)<br>)<br>)  Case No.  Case: 5:18-mc-50119-1<br>)              Judge: Levy, Judith E.<br>)              Filed: 01-23-2018<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.


I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.


**YOU ARE COMMANDED** to execute this warrant on or before _____ February 6, 2018 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____ January 23, 2018    3:54 pm _____

_Judge's signature_

City and state:   Detroit, Michigan _____     Mona K. Majzoub      U. S. Magistrate Judge
                                                        *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*